BANK OF BURWELL, A NEBRASKA BANKING CORPORATION, APPELLANT, V. ROGER KELLEY ET AL., APPELLEES.

445 N.W.2d 871

Filed September 22, 1989.   No. 87-880.

T. Randall Wright, of Dixon & Dixon, P.C., for appellant.

Richard P. Garden, Jr., of Cline, Williams, Wright, Johnson & Oldfather, for appellees.

BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

Plaintiff, Bank of Burwell, appeals from the summary judgment entered in favor of defendants-appellees, Rex Kelley, Roger Kelley, and Florence Kelley White, sometimes hereinafter collectively referred to as the "defendant Kelleys," asserting two assignments of error which merge to challenge the district court's conclusion that plaintiff's notices of sale sent pursuant to Neb. U.C.C. § 9-504(3) (Reissue 1980) were unreasonable as a matter of law and thus would not support a claim for deficiency judgments. We reverse and remand for further proceedings.

Prior to 1976, one Max Kelley, who was a defendant in the trial court but is not a party to this appeal, operated a well-drilling business with Ronald Jensen under the name of Jensen Kelley. In 1976, Max Kelley decided to purchase Jensen's interest in the business. In order to raise capital for this purchase, Max Kelley formed Kelley Irrigation, Inc., and sold stock in the corporation to his mother, the aforenamed Florence Kelley White, and to his brothers, the aforenamed Rex and Roger Kelley. Max Kelley became president and Roger Kelley a vice president of the corporation. While the record is not entirely clear with respect to the official titles of Rex Kelley and Florence Kelley White at given times, it appears that Florence Kelley White served as secretary at the inception of the corporation and later became treasurer. Rex Kelley apparently initially served as treasurer and later became second vice president.

On June 17, 1976, plaintiff loaned the corporation $170,000. At that time each of the Kelley brothers and their mother executed a guaranty agreement, under the language of which each of the four personally guaranteed any future indebtedness the corporation might incur.

Plaintiff's records indicate that the original loan was stamped paid on August 26, 1976. While the record does not provide a means of ascertaining with certainty a complete and detailed record of the corporation's borrowings from June 17, 1976, to March 20, 1985, the date on which the last note was executed, it does show that the corporation had once repaid its entire indebtedness to the plaintiff and that such repayment

occurred sometime prior to 1978.

On April 3, 1978, plaintiff made the corporation another loan of $50,000. Through various renewals and advances taking place from April 3, 1978, to March 20, 1985, the debt grew to $290,000. It appears that all of the notes were signed only by Max Kelley as president of the corporation, including the final $290,000 note dated March 20, 1985, and due on September 16, 1985. The March 20 note references the June 17, 1976, guaranty as part of plaintiff's security on the loan.

Plaintiff's officers had become concerned about the corporation's debt, and on September 28, 1984, plaintiff's then president, Robert McEvoy, sent a letter to Max Kelley and each of the defendant Kelleys informing them that the corporation's line of credit was nearly 90 days past due and reminding them of their status as guarantors. Later in the fall of 1984, McEvoy again wrote to each of the guarantors. Those letters read as follows:

> This is to advise you as an officer as well as a personal guarantor on the above captioned line of credit, that the severely past due note of your corporation must be brought current no later that [sic] December 3, 1984.

> If this second letter is also ignored we will take legal action in this matter. Further, be advised that if the total liquidation of this corporation does not pay the entire principle [sic] plus interst [sic] on this loan, we will then move for a deficiency judgement against your personal assets to the extent necessary to pay the total remaining balance due.

On March 20, 1985, McEvoy sent a second letter to each of the four guarantors, prepared on bank letterhead but signed by Max Kelley, revealing the March 20, 1985, renewal of the corporation's loan. This letter also indicated that the guaranties served as part of the security on the loan.

The March 20, 1985, letters were immediately followed by March 22, 1985, letters which were signed by McEvoy. These referenced the letter over Max Kelley's signature, referenced an enclosed copy of the June 17, 1976, guaranty, confirmed the acquisition of additional collateral from the corporation, and advised the guarantors that plaintiff was "still relying heavily

on your personal guarantee as a very important part of this new arrangement with the corporation."

Subsequently, on September 10, 1985, McEvoy again sent letters to each of the guarantors, informing them that the March 20, 1985, note was due on September 16, 1985, and asking them to "[p]leas [sic] make arrangements to meet this company and personal obligation . . . ."

On March 31, 1986, plaintiff's attorney signed and sent a letter to each of the guarantors, which read:

> You will recall that on June 17, 1976 you executed a Guaranty to the Bank of Burwell to induce the Bank of Burwell to lend money to Kelley Irrigation, Inc., Burwell, Nebraska. Pursuant to that Guaranty, and in reliance thereon, the Bank did lend monies to Kelley Irrigation, Inc. Presently, the corporation owes to the Bank the amount of $290,000.00 plus interest, and that amount has been past due since September 16, 1985. From that time the Bank has worked with the corporation in an attempt to effect an orderly liquidation of the assets. However, to date the corporation has been unable to achieve that goal. We have notified the corporation that if the notes are not paid by April 15, 1986, the Bank will seek legal recourse for the recovery of the amount of the Note and interest. If the amount is not paid by that time, we will be looking for payment from you under the terms of the Guaranty agreement. We would like your cooperation in helping to achieve a workout of this matter so that we can maximize the proceeds of the liquidation and thereby reduce the amount of your liability under the Guaranty. Please contact this office within ten (10) days from the date of this letter so that we can arrange a meeting of the corporation officials and the Guarantors so that the matter can be amicably worked out in the best interests of all parties.

On May 1, 1986, plaintiff's attorney signed and sent another letter to each of the guarantors. This letter indicated that because he had received no response with respect to his earlier letter, plaintiff had filed suit against the "corporation and its Guarantors." The letter also declares:

> In principle, the bank would rather work these things out amicably than to proceed through litigation. As a practical matter, if the bank can solicit your help in liquidating the assets of the corporation, such a voluntary liquidation almost always will bring a greater price than would a forced sale. When one considers that each of you are [sic] personally liable for the indebtedness of the corporation, it would seem to be an advantage to you that the corporation obtain liquidation at the highest possible prices. The bank intends to proceed in each of the matters of litigation to judgment and collection, unless an earlier amicable resolution can be reached.

The defendant Kelleys acknowledge that they received correspondence from plaintiff and its attorney and that they ignored such correspondence based on the belief, notwithstanding the language of the June 17, 1976, guaranty agreement, that the guaranty covered only the initial $170,000 loan and that they thus no longer guaranteed the corporation's debt.

While the defendant Kelleys testified that they ignored the correspondence sent by plaintiff, it appears they did contact an attorney at least as early as June of 1986 in response to this lawsuit.

In any event, on June 18, 1986, plaintiff obtained a judgment allowing it to repossess the corporation's personalty on or after August 25, 1986. Plaintiff then took possession of and began the process of liquidating that collateral.

Prior to selling any of the collateral, plaintiff sent separate notices of such sale to the corporation and to each of the guarantors as "Mr. Max Kelley, President of Kelley Irrigation, Inc.," "Max Kelley," "Florence Kelley White," "Rex Kelley," and "Roger Kelley." The first mailing of such notices apparently took place on August 30, 1986. In most instances, plaintiff also sent copies of the notices to the defendant Kelleys' attorney.

One set of notices with respect to the sale of some of the repossessed property of the corporation was apparently prepared by plaintiff's senior vice president. This set relates to an auction of some of the repossessed property of the

corporation and differs slightly from other notices which plaintiff sent with respect to the sale of other collateral. Other sets of notices were prepared on what appears to be a "standard" form used by plaintiff to notify debtors of an upcoming sale of collateral. A review of these two forms of notice makes it apparent that if the standard form provided reasonable notice to the guarantors, then the other form also provided adequate notice.

The following is a typical example of the standard form notice:

NOTICE OF PRIVATE SALE OF COLLATERAL
ON DEFAULT

To: [Name and address of      Date: November 25, 1986
     notice recipient]

Please take Notice that pursuant to a security agreement, dated ___ March 20 ___ , 1986, between Kelley Irrigation, Inc. ___ and the ___ Bank of Burwell ___ , Burwell, NE, County of Garfield, which was filed in the office of the Clerk ___ of the County of Garfield, State of Nebraska, the undersigned shall sell at private sale your _____
___ 1972 Ford F-750 Truck with 10 T. Smeal ___

_____

_____

which was the collateral pledged pursuant to the security agreement described above, due to the default of the note. The collateral shall·be offered for sale at ___ Kelley ___ Irrigation Inc. Building ___ in Burwell, County of Garfield, State of Nebraska, on ___ Dec. 2, ___ , 1986, after 12:00 p.m. The above collateral items are listed with the offered price from the following individual. You will be liable for any deficiency resulting from the sale of the collateral. You may redeem the collateral by paying the amount due on the obligation secured by the security agreement at any time prior to the date of the sale. This notice is given pursuant to UCC 9-504(3).

Offer to Purchase From:    Tom Mosier ___
                        22946 Fox Street ___
                        Cassopolis, Michigan 49031

Respectfully submitted by:
/s/ Paul E. Rainbolt, S.V.P.
THE BANK OF BURWELL
P.O. Box 610
Burwell, NE 68823

Neb. U.C.C. § 9-504(1) (Reissue 1980) provides that after default, a secured party may sell the collateral. Insofar as is relevant to our inquiry, § 9-504(3) requires that "reasonable" notice be sent the debtor of the intended disposition of the collateral. One who guarantees payment of another's debt is a "debtor" entitled to notice pursuant to the foregoing statute. *American Honda Finance Corp. v. Bennett*, 232 Neb. 21, 439 N.W.2d 459 (1989); *General Electric Credit Corp. v. Lewis*, 230 Neb. 429, 432 N.W.2d 27 (1988); *Deutsche Credit Corp. v. Hi-Bo Farms, Inc.*, 224 Neb. 463, 398 N.W.2d 693 (1987); *Allis-Chalmers Corp. v. Haumont*, 220 Neb. 509, 371 N.W.2d 97 (1985); *First Nat. Bank & Trust Co. v. Hughes*, 214 Neb. 42, 332 N.W.2d 674 (1983).

We have said that "compliance with the requirements of the Uniform Commercial Code for notification as to the disposition of collateral is a condition precedent to a secured creditor's right to recover a deficiency." *First Nat. Bank & Trust Co. v. Hermann*, 205 Neb. 169, 172, 286 N.W.2d 750, 751-52 (1980), citing *Bank of Gering v. Glover*, 192 Neb. 575, 223 N.W.2d 56 (1974). This rule has also been applied and followed in *American Honda Finance Corp. v. Bennett, supra*; *General Electric Credit Corp. v. Lewis, supra*; *Deutsche Credit Corp. v. Hi-Bo Farms, Inc., supra*; and *First Nat. Bank & Trust Co. v. Hughes, supra*. " '[T]he burden of proof is on the secured party to prove compliance with the statutory requirements of notice and reasonableness of notice. . . . Failure to give notice is an absolute bar to the recovery of a deficiency.' " *Citizens State Bank v. Sparks*, 202 Neb. 661, 664, 276 N.W.2d 661, 663 (1979), citing *DeLay First Nat. Bank & Trust Co. v. Jacobson Appliance Co.*, 196 Neb. 398, 243 N.W.2d 745 (1976).

In *Hughes, Hi-Bo Farms, Lewis,* and *Bennett,* the central issue was whether the creditors had provided guarantors with reasonable notice as required by § 9-504(3). Because of the resolution we reach, it becomes necessary to make a detailed

review of each of the four cases last mentioned.

In *Hughes*, Vernor and Diana Hughes personally guaranteed a loan from First National Bank of Fremont to Central Auto & Truck Supply, Inc. Central Auto assets secured the loan. Vernor Hughes was president of Central Auto, and Diana Hughes was secretary of the corporation. On April 1, 1981, after Central Auto defaulted on the loan and the bank had obtained possession of the securing assets, it sent the following letter to the Hughes residence:

"Mr. Venor [sic] Hughes, President
Central Auto & Truck Supply
1558 East 5th
Fremont, NE. 68025

RE: Loan #869930
        Collateral: Financing Statement 5-9-74

Dear Mr. Hughes:
    "This is to notify you that, in connection with the repossession of the above collateral involved in the abovee [sic] account, you may redeem said collateral and terminate the contract relating thereto by payment of $51,417.90 plus interest and expenses any time prior to the sale of said collateral on the date designated below. It is possible for this sum to increase should further expenses of any nature be incurred by our bank.
    "In the event you are not able to fully redeem the collateral or make suitable arrangements for redemption, the collateral will be sold at private sale on or after April 10, 1981 at the present place of storage which is 245 East 5th St., and First National Bank & Trust Company of Fremont.
    "Local, State and Federal laws permitting, you will be held liable for any deficiency declared owing after disposal of this collateral."

*Id.* at 44-45, 332 N.W.2d at 676.

The bank then sold a portion of the securing assets. In determining that the notice was unreasonable and that the bank was thus precluded from obtaining a deficiency judgment against the Hugheses as guarantors of the Central Auto debt,

the court said:

> The April 1 notice in this case makes no reference to the guaranty; indeed, it makes reference only to the "Financing Statement 5-9-74," in fact a security agreement dated May 24, 1974, a document which was signed individually by neither Mr. Hughes nor Mrs. [Diana] Hughes. In that regard the notice fails to apprise either Mr. or Mrs. Hughes that a personal deficiency judgment might be sought against any one of them in his or her capacity as guarantor of the corporation's debt. Secondly, as between Mr. Hughes and Central Auto, the matter as to whom the notice was sent is ambiguous. The interest of Mr. Hughes in this context conflicts with that of the corporation. It cannot be said that the notice, as addressed, unmistakably advises Mr. Hughes personally that he is the "you" who may be held "liable for any deficiency declared owing after disposal of this collateral." To assume that Mr. Hughes would know that a deficiency could not be obtained against the bankrupt Central Auto is to assume something not supported by the record before us. Although the statement that ambiguous language is to be construed against the drafter of the language is generally applied in the case of insurance policies, *Niemeyer v. Estate of Tichota*, 191 Neb. 484, 215 N.W.2d 885 (1974), the reasoning behind that rule is equally applicable to notices of the nature involved here.

*First Nat. Bank & Trust Co. v. Hughes,* 214 Neb. 42, 46-47, 332 N.W.2d 674, 677 (1983).

In *Deutsche Credit Corp. v. Hi-Bo Farms, Inc.,* 224 Neb. 463, 398 N.W.2d 693 (1987), Hi-Bo purchased farm machinery on a retail installment contract. Four of its corporate officers, namely Dale Hinz, president; Carol Hinz, secretary; Allen Bors, vice president; and Janice Bors, treasurer, each personally guaranteed the installment debt. After Hi-Bo had defaulted on the obligation and had surrendered possession of the machinery to the creditor, Deutsche Credit Corporation, Deutsche mailed a separate notice of private sale of the collateral to Hi-Bo, as well as to each of the guarantors. Each notice read as follows:

"RE: HI-BO FARMS INC.

"You are hereby notified by and on behalf of the undersigned secured party that by virtue of the default under the terms and provisions of a security agreement executed by the captioned Debtor dated 06-28-81, the undersigned secured party, holder of the aforesaid agreement and the indebtedness represented therby [sic] will, on or after 08-18-84 make one or more private sales or other dispositions of our right, title and interest in and to the goods described in said agreement, which goods may be described as follows:

ONE WHITE 9700 COMBINE S/N 97-20218

W/CORNHEAD S/N A90065, AND KWICK CUT HEAD S/N 912118

The net proceeds of sale (less expenses incurred) shall be, in accordance with said agreement, applied to the reduction of total obligation due and owing by Debtor to the undersigned secured party.

"Dated this 7TH day of AUGUST, 1984.

Deutsche Credit Corporation"

*Id*. at 465, 398 N.W.2d at 695.

Deutsche sold the equipment on October 3, 1984, and subsequently sought a deficiency judgment against the corporate officers who had personally guaranteed the Hi-Bo debt. In upholding the summary judgment dismissing Deutsche's petition, the court wrote:

The guarantors contend that the notices in the present case are indistinguishable from the notice in *Hughes*. Plaintiff argues that, on the contrary, its notices are different from the notice in *Hughes* in several important respects. First of all, while in *Hughes* there was but a single notice, in the present case each of the guarantors was sent a separate notice. While the notice in *Hughes* was addressed to the president of the corporate debtor, each of the notices to the guarantors in this case was addressed to a guarantor individually, and no reference was made to the guarantor's capacity as an officer of the corporate debtor. While the notice in *Hughes* directed specific attention to

"Collateral: Financing Statement 5-9-74," which the guarantor had not signed, the notices in this case directed attention to the entire "HI-BO FARMS INC." transaction. Plaintiff concludes that these distinctions are such that the guarantors had no reasonable basis to conclude that the notices were sent to them in their capacity as corporate officers rather than to them in their own individual capacities.

The guarantors, on the other hand, point to the facts that, as did the notice in *Hughes*, the notices in this case refer only to Hi-Bo Farms as the debtor. Moreover, as the notice in *Hughes* failed to make any reference to the guaranties executed by the Hugheses, so in this case did the notices limit themselves to the "default under the terms and provisions of a security agreement executed by the captioned Debtor . . . ." Thus, the guarantors argue that the notices are, at best, ambiguous and, as such, constitute no notice at all insofar as they individually are concerned.

We conclude that the notices are ambiguous as a matter of law with respect to the guarantors. They refer to but a single debtor, Hi-Bo Farms, and refer only to the security agreement executed by that debtor solely. That ambiguity is to be resolved against plaintiff as the drafter of the notices.

*Hi-Bo Farms, supra* at 468, 398 N.W.2d at 696-97.

In *General Electric Credit Corp. v Lewis*, 230 Neb. 429, 432 N.W.2d 27 (1988), Gerald Lewis executed a guaranty in favor of General Electric Credit Corporation and covering the present and future debts of William Thompson III and Donna Ahrens. General Electric then extended a loan to Thompson and Ahrens; the loan was secured by a Mack truck tractor.

After Thompson and Ahrens had defaulted on the loan and General Electric had repossessed the Mack tractor, General Electric sent the following " 'NOTICE OF SALE OF COLLATERAL' " to Lewis:

"TO: Gerald B. Lewis
C/O Lewis Service Center
4101 West "O" Street

Lincoln, NB 68528

"PLEASE TAKE NOTICE that the following described collateral of which we have taken possession pursuant to Chattel Mortgage dated August 10, 1983 in which William Thompson III and Donna Ahrens is the Debtor and we are the Secured Party, will be sold by: . . . Private Sale on or after November 30, 1983 at 2333 Waukegan Road, Bannockburn, Illinois 60015

"DESCRIPTION OF COLLATERAL: One (1) 1981 Mack Truck Tractor . . . ."

*Id.* at 430-31, 432 N.W.2d at 28.

In holding the notice unreasonable, this court declared:

Apparently implicit in [*Hughes* and *Hi-Bo Farms*] is Neb. U.C.C. § 9-504 comment 5 (Reissue 1980), namely, one of the purposes of the Uniform Commercial Code notice provisions is assurance that "persons entitled to receive [notice] will have sufficient time to take appropriate steps to protect their interests." Consequently, this court has concluded that, because reasonable notice of sale is designed to give a guarantor an opportunity to protect the guarantor's interest, a notice which fails to inform the guarantor concerning an interest to protect, namely, potential liability for a deficiency after sale, is not reasonable. Therefore, to satisfy the requirement of reasonable notice, as a prerequisite concerning a guarantor's liability for a deficiency, § 9-504(3) requires that the secured party-creditor inform the guarantor of a debt concerning the guarantor's potential liability for a deficiency on sale of collateral after the principal debtor's default. *Deutsche Credit Corp. v. Hi-Bo Farms, Inc., supra; First Nat. Bank & Trust Co. v. Hughes, supra.*

The notice sent to Lewis, as guarantor, is deficient in view of [*Hi-Bo Farms*] and *Hughes*, because [General Electric's] notice failed to refer to Lewis' guaranty and did not inform Lewis that he, as a guarantor of the Thompson-Ahrens debt, would be liable for any deficiency after sale of the collateral. Instead, the notice referred only to Thompson and Ahrens as debtors, and to the "chattel mortgage" signed by those debtors. Since

[General Electric's] notice to Lewis failed to inform him that [General Electric] would seek a personal deficiency judgment against Lewis in his capacity as a guarantor, the notice was unreasonable under § 9-504(3).

*Lewis, supra* at 433-34, 432 N.W.2d at 30.

The reasonableness of the notice to a guarantor was most recently considered in *American Honda Finance Corp. v. Bennett*, 232 Neb. 21, 439 N.W.2d 459 (1989). Therein, Ronald and Shirley Bennett served as corporate officers of Bennett's Gun & Cycle, Inc., and personally guaranteed that corporation's obligations to American Honda Finance Corporation. The credit which American Honda had extended to Bennett's Gun & Cycle was secured by a portion of the corporation's inventory.

After Bennett's Gun & Cycle had defaulted and American Honda had recovered its collateral, American Honda mailed identical notices of private sale to the Bennetts and to Bennett's Gun & Cycle. The only difference between the notices was the first line of the inside address. The notices stated:

"RE: Repossessed Motorcycles and Power Equipment

Dear Ronald and Shirley Bennett:

"Pleae [sic] be advised that on or after 8:00 AM, on October 24, 1986, American Honda Finance Corporation will sell at private sale the collateral heretofore repossessed from you by American Honda Finance Corporation pursuant to the Security Agreement between you and American Honda Finance Corporation. Such collateral consist of Motorcycles and Power Equipment."

*Id.* at 22, 439 N.W.2d at 461.

The court concluded that the notice of private sale was sufficiently ambiguous as to be unreasonable and thus foreclose a deficiency judgment. In so ruling, it stated:

To be reasonable, the notice must inform the guarantor of his potential liability for a deficiency on the sale of collateral after the principal debtor's default [citing *Lewis, Hi-Bo Farms*, and *Hughes*].

Separate notices were sent to the primary debtor and the guarantors; however, the notice to the Bennetts states it was sent "pursuant to the Security Agreement between

you and American Honda Finance Corporation." The notice made no reference to the guaranty agreement signed by the Bennetts. The notice received by the Bennetts referred only to collateral in the form of motorcycles and power equipment repossessed from "you." From the notice, it is clear the "you" referred to is Bennett's Gun & Cycle, not Ronald and Shirley Bennett. Nor does the notice give any indication that the Bennetts may be held liable for any deficiency which results from the sale. Therefore, this notice was deficient as a matter of law.

*Bennett, supra* at 24-25, 439 N.W.2d at 462.

The standard form notices in this case were sent to the defendant Kelleys as "Roger Kelley," "Rex Kelley," and "Florence Kelley White," without indicating whether they were being given notice in their corporate or individual capacities. This confusion is compounded by the fact the notices declare that plaintiff would "sell at private sale *your* [description of items to be sold] which was the collateral pledged pursuant to the security agreement described above . . . ." (Emphasis supplied.) The use of the term "your" before the description of the collateral to be sold exacerbates the doubt as to whether the notices were sent to the defendant Kelleys as individuals or as corporate officers. Moreover, while the standard form notices state that "[y]ou will be liable for any deficiency," the use of the term "your" before the description of the collateral makes it unclear whether plaintiff was giving notice it would seek to hold the defendant Kelleys as individuals or the corporation liable for any deficiency. Finally, the notices omit any reference to the guaranty the defendant Kelleys signed. It is these ambiguities which the defendant Kelleys argue entitle them to summary judgment under the *Hughes* line of cases.

It is to be noted, however, that in that line of cases, the notices represented the creditors' only efforts to inform the guarantors of their stake in the collateral. Consequently, the ambiguities were necessarily resolved against the creditors as the drafters of the notices, rendering the notices unreasonable.

Conversely, the plaintiff in this case made a concerted effort to ensure that the defendant Kelleys were fully informed of

their stake in collateral which was to be sold. On numerous occasions plaintiff reminded the defendant Kelleys of the guaranty which they had signed, at one point going so far as to mail each of them a copy of the document. And via correspondence, plaintiff made it clear that each of them, as guarantor, would be personally liable for any deficiency remaining after the corporation's assets were liquidated.

Plaintiff therefore urges that parol evidence should be considered in determining whether its notices contained sufficient information to apprise the defendant Kelleys that they needed to protect their interests as guarantors, and were thus reasonable; that is, the determination should be made in light of the entire conduct of the parties.

In support of this position plaintiff cites us to *Olds v. Jamison*, 195 Neb. 388, 238 N.W.2d 459 (1976), a case involving a lease. Therein, this court said:

> Parol evidence is generally admissible when it is offered for the purpose of explaining and showing the true nature of the transaction between the parties. [Citation omitted.] In any event, this court has ordinarily applied the parol evidence rule only in the absence of fraud, mistake, or ambiguity. [Citation omitted].
>
> A written instrument is open to explanation by parol evidence when its terms are susceptible to two constructions or where the language employed is vague or ambiguous.

*Id.* at 391-92, 238 N.W.2d at 462. This rule is restated and followed in *Mahoney v. May*, 207 Neb. 187, 297 N.W.2d 157 (1980), and *Lovelace v. Stern*, 207 Neb. 174, 297 N.W.2d 160 (1980), both cases involving the construction of contracts for the sale of real estate. Like *Olds*, *Mahoney* also notes that "[p]arol evidence is generally admissible where it is offered for the purpose of explaining and showing the true nature of the transaction between the parties." *Mahoney* at 191, 297 N.W.2d at 160. And, more recently, in *Washington Heights Co. v Frazier*, 226 Neb. 127, 409 N.W.2d 612 (1987), this court noted that parol evidence is admissible to explain vague language in a written contract.

We therefore hold that whether a creditor's notice under the

provisions of § 9-504(3) sufficiently informs a guarantor of his or her status as such, of the default of the principal debtor, and of the guarantor's obligations, rights, and stake in the collateral, and is therefore reasonable, must be determined in light of the entire conduct of the parties.

Such holding compels the conclusion that there indeed exist in this case genuine issues as to material facts. Summary judgment is appropriate where there exists no genuine issue as to any material fact or as to the ultimate inferences which may be drawn from the material facts and the moving party is entitled to judgment as a matter of law. *First Security Sav. v. Aetna Cas. & Surety Co., ante* p. 335, 445 N.W.2d 596 (1989); *Gatzemeyer v. Neligh Township, ante* p. 329, 445 N.W.2d 593 (1989); *State Farm Fire & Cas. Co. v. Victor,* 232 Neb. 942, 442 N.W.2d 880 (1989). Consequently, the summary judgment in favor of the defendant Kelleys must be reversed and the cause remanded for further proceedings.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.

HASTINGS, C.J., not participating.

WHITE, J., dissenting.

The majority, by allowing parol evidence to determine whether the notices sent the guarantors pursuant to the provisions of Neb. Rev. Stat. § 9-504(3) (Reissue 1980) were reasonable under the circumstances, departs from the bright line approach to notice requirements adopted by this court in *First Nat. Bank & Trust Co. v. Hughes,* 214 Neb. 42, 332 N.W.2d 674 (1983); *Deutsche Credit Corp. v. Hi-Bo Farms, Inc.,* 224 Neb. 463, 398 N.W.2d 693 (1987); *General Electric Credit Corp. v. Lewis,* 230 Neb. 429, 432 N.W.2d 27 (1988); and *American Honda Finance Corp. v. Bennett,* 232 Neb. 21, 439 N.W.2d 459 (1989).

I would adhere to precedent and affirm the granting of summary judgment in favor of the defendant Kelleys.

FAHRNBRUCH, J., dissenting

I join in Judge White's dissent. Abolition of the bright line approach to notice requirements under Neb. Rev. Stat. § 9-504(3) (Reissue 1980) will create uncertainty where

certainty has existed, and it will encourage prolific litigation in an already overburdened judicial system.